**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| IBO BOONE, | : | |
| | : | DKT No.: |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHRIS IMPARATO, in his individual | : | |
| capacity only; GARRETT KRUGER, | : | |
| in his individual capacity only; | : | |
| MARC LEPORE, in his individual | : | |
| capacity only; | : | |
| | : | |
| Defendants. | : | October 31, 2025 |

## <u>COMPLAINT</u>

1.     Ibo Boone spent 5 years, 1 month, and 15 days in prison on a $1,000,000 bond for a crime that police knew he did not commit because Norwalk Police and state prosecutors alleged that he was a street gang member who murdered a man named Michael Robinson in Norwalk, Connecticut on October 29, 2010. A jury, however, acquitted Boone of all charges in a matter of hours on November 11, 2022.

2.     The investigation of Robinson's murder and the prosecution of Boone treated Boone's constitutional rights as non-existent. It featured a more-than-decade-long concealment of evidence clearly establishing Boone's alibi by police and prosecutors, failure to disclose that evidence to the investigative grand jury and the judge who signed Boone's arrest warrant, the specious smearing of Boone and the witnesses who supported his alibi as violent gang leaders, enforcers, and members, and other coercive tactics designed to solve an unsolvable cold case by pinning the blame on someone whom society would not care about.

1

3.     For 12 years, Norwalk Police possessed hospital surveillance video verifying Boone's alibi: He was visiting a friend's newborn daughter at a hospital at the time of the murder and entered the hospital approximately 2 minutes after Robinson's murder. Norwalk Police, however, failed to document the times of the video surveillance when they initially gathered it in 2010.

4.     Upon information and belief, during their initial investigation in 2010, Norwalk Police received statements from friends of Boone, verifying that Boone was at the hospital at the time of the murder. They never documented those statements.

5.     Based on this evidence, Norwalk Police and state prosecutors did not charge Boone for Robinson's murder in 2010 or 2013 when they first identified him as a suspect.

6.     At some point, the investigation into Robinson's murder was turned over to the Chief State's Attorney's cold case unit.

7.     The new investigation profiled Boone as a leader and enforcer for a Norwalk street gang called Money Green/Rollin 20'S ("Money Green") – an offshoot of the Bloods street gang. It also profiled Robinson as a member of the Westside Crips street gang who had previously identified a member of Money Green as the perpetrator of another gang-related murder.

8.     Extensive grand jury testimony occurred, and, despite Connecticut law requiring the presentation of exculpatory evidence to an investigative grand jury, the critical facts supporting Boone's innocence were never presented to the investigative grand jury despite being known to police and prosecutors for almost 7 years at that time.

9.      On September 19, 2017, Defendant Chris Imparato obtained an arrest warrant for Boone that meticulously detailed alibis for numerous other suspects in the murder of Robinson. It, however, did not detail any of the evidence that police and prosecutors had that supported Boone's alibi, except Boone's own statement that he had been at the hospital at the time of the murder.

10.     Instead, Imparato's affidavit presented half-baked innuendo about gangs and sanitized statements from individuals looking to avoid consequences for their own crimes. Imparato, however, never sought Boone's arrest for any kind of conspiracy related to gangs, and Boone was never prosecuted for gang activity.

11.     Prosecutors then failed to turn over the hospital surveillance footage to defense counsel for 20 months or more, repeatedly telling him to talk to Imparato who would profess ignorance when pressed about the video.

12.     The resulting criminal prosecution and withholding of exculpatory evidence from Boone by the Defendants deprived him of 5 years, 1 month, and 15 days of his life. It has also destroyed Boone's reputation and life as a simple Google search will reveal breathless media accounts of his alleged gang involvement in a murder. He now seeks justice for lost time, dreams, hopes, and everything else that makes life worth living and of which he was deprived during that time.

## **PARTIES**

13.     Ibo Boone is a permanent resident of New York, New York.

14.     Chris Imparato is a Norwalk, Connecticut police officer. He is sued in his individual capacity only.

15.     Garrett Kruger is a Norwalk, Connecticut police officer. He is sued in his individual capacity only.

16.     Marc Lepore is a Norwalk, Connecticut police officer. He is sued in his individual capacity only.

## JURISDICTION

17.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 2201, and 1367 as well as 42 U.S.C. § 1983. Venue is appropriate under 28 U.S.C. § 1391 because all of the factual events giving rise to the cause of action occurred in Connecticut.

## FACTUAL ALLEGATIONS

### *The Murder Of Michael Robinson.*

18.     On October 29, 2010 at approximately 7:02 PM, Norwalk Police responded to the area of South Main Street and Grove Street for a report of shots fired.

19.     Upon arrival, they found Michael Robinson suffering from two gunshot wounds.

20.     Despite life-saving measures, medical personnel were unable to revive Robinson and pronounced him dead at 8:05 PM on October 29, 2010.

21.     The medical examiner subsequently declared Robinson's death to be a homicide.

22.     Police never recovered the murder weapon, which they believed to be a .38 caliber firearm. Detectives at the crime scene could not locate any shell casings.

23.     Many people in the neighborhood of murder acknowledged hearing shots, but none admitted to being eyewitnesses.

24.     An anonymous witness, however, identified a suspect, Eric Henry, who went by the street name of "New York."

### Police Form An Initial Gang-Related Theory.

25.     Norwalk police suspected that Henry was a drug deal associated with an alleged Norwalk street gang known as Money Green/Rollin 20'S ("Money Green") – a suspected offshoot of the Bloods street gang.

26.     Norwalk police also suspected that Robinson was a member of the Westside Crips gang and knew that he had given police a written statement identifying an alleged member of Money Green as the perpetrator of the murder of a rival gang member.

27.     Upon information and belief, Norwalk police suspected that Money Green was involved in several gang wars in Norwalk.

28.     Norwalk police officers located Henry on October 29, 2010 at some point after the shooting. Henry provided officers with a receipt from a CVS Pharmacy that showed he was at the CVS seven minutes after the time of Robinson's murder was reported.

29.     Investigators confirmed Henry's alibi on October 30, 2010.

### Officers Continue To Investigate Alleged Money Green Members And Come Up Empty.

30.     On October 30, 2010, investigators turned to a confidential witness who they had taken into custody that day.

31.    They assembled a photo array of individuals that they suspected were Money Green members or associated in some way with Money Green members. This array consisted of pictures of Kingston Gayle, Ibo Boone, Stacy Sawyer, Eric Henry, Jamaul Pratt, Dwayne Leak, and Andre McCrae.

32.    The confidential witness identified Kingston Gayle as the witness on October 30, 2010.

33.    Norwalk police took Gayle into custody and interrogated him about his whereabouts on October 29, 2010. Gayle explained that he was in Pelham, NY participating in job training for a job at Fairway Market. Police were able to confirm from his employer's records that he did not clock out of work in Pelham until after Robinson's murder.

### Officers Interrogate Boone And Find Evidence Clearing Him Of Any Involvement In Robinson's Murder.

34.    On December 14, 2010, Norwalk police interviewed Boone about Robinson's murder.

35.    Boone explained to them that, on October 29, 2010, he had been driving around South Norwalk with friends.

36.    They then dropped him off at Carlton Court, and he went to the Norwalk Hospital to see Andre McCrae's new baby with Jamaul Pratt and Stacey Sawyer

37.    Upon information and belief, Defendants Kruger and Lepore went to the Norwalk Hospital and gathered more than 5 hours of video surveillance footage.

38.    This video surveillance footage showed Boone, Pratt, and Sawyer entering the Norwalk Hospital two minutes after Robinson had been murdered.

39.     Norwalk Hospital is 1.6 miles from the scene of Robinson's shooting, and it is at least a ten-minute drive from the crime scene.

40.     Upon information and belief, despite placing the video surveillance footage in the case file, Defendants Kruger and Lepore purposely never documented the evidence clearing Boone and remained silent for more than a decade about their discovery while Boone languished in jail for 5 years, 1 month, and 15 days.

### Officers Reidentify Boone As A Suspect After 3 Years Of No Leads.

41.     The investigation then went cold until 2013.

42.     On September 23, 2013, the confidential witness who previously identified Gayle as the shooter was arrested and immediately volunteered information about the Robinson murder.

43.     The witness told investigators that he saw Ibo Boone and Robinson arguing over money and then saw Boone shoot Robinson.

44.     He explained that he had lied during his first interview because he feared that Boone would retaliate against him, and he only changed his story after speaking to Robinson's mother.

45.     The witness then identified Boone from a photo array on September 23, 2013.

### Investigators Build A Case Around Arrestees Seeking To Escape Criminal Consequences.

46.     After the confidential witness accused Boone of murdering Robinson on September 23, 2013, the Defendants and prosecutors pressed ahead with their gang theory and pressured testimony from arrestees and incarcerated individuals to identify Boone as the shooter despite possessing the evidence that cleared Boone.

47.     Prosecutors convened an investigative grand jury pursuant to Conn. Gen. Stat. § 54-47c in 2016 and 2017 to investigate charges against Money Green members.

48.     They then solicited testimony and statements from two arrestees, a witness under the influence of narcotics at various points during her interactions with police, witnesses who mistook other individuals instead of Boone as the shooter, and numerous witnesses who relied almost exclusively on hearsay to accuse Boone of murdering Robinson.

49.     Conn. Gen. Stat. § 54-47f(f) requires prosecutors to disclose to the investigatory grand jury any exculpatory evidence concerning anyone who is the target of the grand jury's investigation.

50.     Upon information and belief, the prosecutors pursuing Boone's prosecution relied exclusively on the Defendants, especially Defendant Imparato, to keep them aware of exculpatory information.

51.     Despite knowing of this reliance and of the exculpatory evidence pertaining to Boone, none of the Defendants apprised the prosecutors of the evidence clearing Boone that was in their possession.

52.     Upon information and belief, all of the Defendants testified before the investigative grand jury, and, at no point, did they disclose the video evidence clearing Boone or explain their findings regarding it to the grand jury.

### Boone Is Arrested, Prosecuted, And Acquitted.

53.     On or about September 19, 2017, Defendant Imparato applied for an arrest warrant charging Boone with the murder of Robinson.

54.    Imparato's arrest warrant application went to painstaking detail to outline how investigators verified every other suspect's alibi.

55.    Imparato's arrest warrant application, however, was silent on the exculpatory evidence in his possession that completely cleared Boone of any involvement in Robinson's murder despite Imparato knowing that the evidence existed.

56.    Instead, Imparato's affidavit painted Boone as a violent drug dealer who was an out-of-town leader and enforcer for Money Green and the Bloods.

57.    At some point after Boone's arrest on or about September 27, 2017, Attorney Philip Russell appeared for him and began an aggressive defense for him.

58.    Boone, however, was held on a $1,000,000, which he could not afford to post.

59.    Attorney Russell repeatedly requested all *Brady* material, including Norwalk Hospital surveillance footage, supporting Boone's alibi defense.

60.    Every time that Attorney Russell asked for this exculpatory material, prosecutors referred him to Defendant Imparato who would profess ignorance of any such surveillance footage that would clear Boone.

61.    Defendants Kruger and Lepore also never disclosed to the prosecutors during this time that they had gathered evidence that cleared Boone of any involvement in Robinson's murder despite knowing that they did.

62.    Finally, after 20 months of fighting on Boone's behalf, Attorney Russell finally obtained the Norwalk Hospital surveillance footage.

63.    That footage showed Boone entering the Norwalk Hospital approximately two minutes after Norwalk police responded to the shots fired call for Robinson's murder.

9

64.    Because of advances in technology though, prosecutors remained unconvinced of Boone's innocence. The newer security camera software improperly displayed the time that it was capturing so that the footage did not align with Boone's alibi.

65.    The older security camera software, however, did display the correct time – the same time that Defendants Kruger and Lepore knew supported Boone's alibi, yet deliberately failed to document.

66.    But the error made by newer security camera software still did not align with the prosecution's theory of the case or common sense. It displayed times well after sunset in Norwalk when the security camera footage depicted a brightly shining sun outside.

67.    Upon information and belief, Defendants Imparato, Kruger, and Lepore all knew that the newer security software was time-stamping the footage incorrectly, but deliberately ignored it and concealed it from the investigative grand jury, the prosecutors, and the judge who the arrest warrant was presented to because it did not fit their objective of putting Boone behind bars for the rest of his life.

68.    Because of these deliberate omissions and delays, Boone was forced to sit in jail for over 5 years and take his case to trial more than 5 years after he had been charged.

69.    A jury acquitted Boone after only hours of deliberation based on the video evidence.

## COUNT ONE – 42 U.S.C. § 1983 CLAIM FOR FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT AGAINST ALL DEFENDANTS

70.    Paragraphs 1 through 68 are incorporated herein.

71.    Each of the Defendants knew of the video surveillance footage that completely cleared Ibo Boone of any involvement in Michael Robinson's murder.

72.    Each of the Defendants knew that the video surveillance footage completely cleared Ibo Boone of any involvement in Robinson's murder.

73.    Defendants Kruger and Lepore knew when they reviewed the video surveillance from Norwalk Hospital that Boone had no involvement in Robinson's murder. They, however, intentionally or recklessly failed to document their knowledge despite knowing that they should have.

74.    Each of the Defendants provided sworn testimony to the investigative grand jury convened to investigate Robinson's murder.

75.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose that they were in possession of evidence that completely cleared Boone of any involvement in Robinson's murder.

76.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose the evidence that completely cleared Boone of any involvement in Robinson's murder.

77.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose that they knew that Boone had no involvement in Robinson's murder.

78.    At no point in his affidavit for Boone's arrest did Defendant Imparato disclose that police possessed evidence that completely cleared Boone of involvement in Robinson's murder and that he knew of the nature of the exculpatory evidence.

79.    At no point in his affidavit for Boone's arrest did Defendant Imparato disclose that he knew that Boone had no involvement in Robinson's murder.

80.    As a result of these intentional or reckless failures, Boone was arrested and held on a $1,000,000 bond, which he could not afford to post.

11

81.    At no point during the pendency of Boone's criminal prosecution did any of the Defendants reveal that they knew that the video surveillance footage completely cleared Boone of any involvement in Robinson's murder.

82.    Despite knowing this, Defendant Imparato intentionally or recklessly delayed turning over the video surveillance footage to Attorney Russell for use in Boone's defense for 20 months.

83.    After Defendant Imparato turned over the video surveillance footage to Attorney Russell and he confronted the prosecution about the importance and materiality of the evidence, none of the Defendants told prosecutors or the court that the evidence completely cleared Boone of any involvement in Robinson's murder despite knowing that it did.

84.    Instead, the Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

85.    The Defendants maintained this false narrative for over a decade.

86.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

87.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest.

88.    As a result of the Defendants' actions, Ibo Boone – an innocent man – was unlawfully arrested and spent 5 years, 1 month, and 15 days in prison in violation of his Fourth Amendment right to be free from false arrests.

## COUNT TWO – 42 U.S.C. § 1983 CLAIM FOR MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AMENDMENT AGAINST ALL DEFENDANTS

89.    Paragraphs 1 through 88 are incorporated herein.

90.    The Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

91.    The Defendants maintained this false narrative for over a decade.

92.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

93.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest and continued imprisonment.

94.    The Defendants' actions and omissions initiated and continued criminal proceedings against Boone.

95.    The criminal proceedings against Boone terminated in his favor by virtue of his jury's acquittal on all charges.

96.    The Defendants acted without probable cause in securing his arrest.

97.    The Defendants acted with malice toward Boone by profiling him, based on their own prejudices, as a violent, out-of-state drug dealer who doubled as an enforcer

for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

98.    As a result of the Defendants' malicious prosecution of him, Ibo Boone – an innocent man – was unlawfully arrested and spent 5 years, 1 month, and 15 days in prison in violation of his Fourth Amendment right to be free from malicious prosecution.

## COUNT THREE – 42 U.S.C. § 1983 CLAIM FOR FALSE IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT.

99.    Paragraphs 1 through 98 are incorporated herein.

100.    The Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

101.    The Defendants maintained this false narrative for over a decade.

102.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

103.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest and continued imprisonment.

104.    The Defendants' actions and omissions initiated and continued criminal proceedings against Boone.

105.    The criminal proceedings against Boone terminated in his favor by virtue of his jury's acquittal on all charges.

106.    The Defendants acted without probable cause in securing his arrest.

14

107.    The Defendants acted with malice toward Boone by profiling him, based on their own prejudices, as a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

108.    As a result of the Defendants' conduct, Ibo Boone – an innocent man – was unlawfully arrested and imprisoned for 5 years, 1 month, and 15 days in violation of his Fourth Amendment right to be free from false imprisonment.

## COUNT FOUR – 42 U.S.C. § 1983 CLAIM FOR DEPRIVATION OF THE RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AGAINST ALL DEFENDANTS

109.    Paragraphs 1 through 108 are incorporated herein.

110.    Prosecutors delegated the practical responsibility for the production of *Brady* material to the Defendants, chiefly Defendant Imparato, during their handling of the case.

111.    When repeatedly pressed by Attorney Russell, prosecutors and Defendant Imperato denied, for almost 20 months, the existence of the exculpatory video evidence that completely cleared Boone of any involvement in Robinson's murder.

112.    The exculpatory video evidence was material to every aspect of Boone's defense because it completely cleared him of any involvement in Robinson's murder.

113.    At any point during Boone's prosecution, any of the Defendants could have provided the exculpatory evidence to prosecutors or directly to Attorney Russell, but they deliberately, intentionally, and recklessly chose not to for 20 months.

114.    The Defendants' actions in withholding the material, exculpatory video evidence and failing to disclose their knowledge of it impacted every aspect of Boone's defense, including but not limited to:

      a.    Depriving his counsel of the evidence necessary to present convincing bail arguments to secure Boone's release from prison,

      b.    Preventing his counsel from pursuing a *Franks* motion to challenge the sufficiency of probable cause in Boone's arrest warrant; and

      c.    Frustrating his counsel's ability to present a case to prosecutors and the court that a dismissal of the charges against Boone was in the interests of justice.

115.    The Defendants' actions and omissions were intentional, deliberate, and reckless.

116.    The Defendants' actions and omissions violated Boone's right to due process under the Fourteenth Amendment.

## COUNT FIVE – *BINETTE* CLAIM FOR UNLAWFUL SEIZURE UNDER ARTICLE FIRST, §§ 7 & 9 OF THE CONNECTICUT CONSTITUTION.

117.    Paragraphs 1 through 116 are incorporated herein.

118.    Each of the Defendants knew of the video surveillance footage that completely cleared Ibo Boone of any involvement in Michael Robinson's murder.

119.    Each of the Defendants knew that the video surveillance footage completely cleared Ibo Boone of any involvement in Robinson's murder.

120.    Defendants Kruger and Lepore knew when they reviewed the video surveillance from Norwalk Hospital that Boone had no involvement in Robinson's murder.

They, however, intentionally or recklessly failed to document their knowledge despite knowing that they should have.

121.    Each of the Defendants provided sworn testimony to the investigative grand jury convened to investigate Robinson's murder.

122.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose that they were in possession of evidence that completely cleared Boone of any involvement in Robinson's murder.

123.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose the evidence that completely cleared Boone of any involvement in Robinson's murder.

124.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose that they knew that Boone had no involvement in Robinson's murder.

125.    At no point in his affidavit for Boone's arrest did Defendant Imparato disclose that police possessed evidence that completely cleared Boone of involvement in Robinson's murder and that he knew of the nature of the exculpatory evidence.

126.    At no point in his affidavit for Boone's arrest did Defendant Imparato disclose that he knew that Boone had no involvement in Robinson's murder.

127.    As a result of these intentional or reckless failures, Boone was arrested and held on a $1,000,000 bond, which he could not afford to post.

128.    At no point during the pendency of Boone's criminal prosecution did any of the Defendants reveal that they knew that the video surveillance footage completely cleared Boone of any involvement in Robinson's murder.

129.    Despite knowing this, Defendant Imparato intentionally or recklessly delayed turning over the video surveillance footage to Attorney Russell for use in Boone's defense for 20 months.

130.    After Defendant Imparato turned over the video surveillance footage to Attorney Russell and he confronted the prosecution about the importance and materiality of the evidence, none of the Defendants told prosecutors or the court that the evidence completely cleared Boone of any involvement in Robinson's murder despite knowing that it did.

131.    Instead, the Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

132.    The Defendants maintained this false narrative for over a decade.

133.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

134.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest.

135.    As a result of the Defendants' actions, Ibo Boone – an innocent man – was unlawfully arrested and spent 5 years, 1 month, and 15 days in prison in violation of his right to be free from unlawful seizures under Article First, §§ 7 and 9 of the Connecticut Constitution.

## COUNT SIX – *BINETTE* CLAIM FOR MALICIOUS PROSEUCTION UNDER ARTICLE FIRST, §§ 7 & 9 OF THE CONNECTICUT CONSTITUTION.

136.    Paragraphs 1 through 135 are incorporated herein.

137.    The Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

138.    The Defendants maintained this false narrative for over a decade.

139.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

140.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest and continued imprisonment.

141.    The Defendants' actions and omissions initiated and continued criminal proceedings against Boone.

142.    The criminal proceedings against Boone terminated in his favor by virtue of his jury's acquittal on all charges.

143.    The Defendants acted without probable cause in securing his arrest.

144.    The Defendants acted with malice toward Boone by profiling him, based on their own prejudices, as a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

145.    As a result of the Defendants' actions, Ibo Boone – an innocent man – was unlawfully arrested and spent 5 years, 1 month, and 15 days in prison in violation of his right to be free from malicious prosecution under Article First, §§ 7 and 9 of the Connecticut Constitution.

## COUNT SEVEN – *BINETTE* CLAIM FOR FALSE IMPRISONMENT UNDER ARTICLE FIRST, §§ 7 & 9 OF THE CONNECTICUT CONSTITUTION.

146.    Paragraphs 1 through 145 are incorporated herein.

147.    The Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

148.    The Defendants maintained this false narrative for over a decade.

149.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

150.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest and continued imprisonment.

151.    The Defendants' actions and omissions initiated and continued criminal proceedings against Boone.

152.    The criminal proceedings against Boone terminated in his favor by virtue of his jury's acquittal on all charges.

153.    The Defendants acted without probable cause in securing his arrest.

154.    The Defendants acted with malice toward Boone by profiling him, based on their own prejudices, as a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

155.    As a result of the Defendants' conduct, Ibo Boone – an innocent man – was unlawfully arrested and imprisoned for 5 years, 1 month, and 15 days in violation of his rights under Article First, §§ 7 and 9 of the Connecticut Constitution to be free from false imprisonment.

**COUNT EIGHT – *BINETTE* CLAIM FOR VIOLATION OF DUE PROCESS RIGHTS UNDER ARTICLE FIRST, § 8 OF THE CONNECTICUT CONSTITUTION.**

156.    Paragraphs 1 through 155 are incorporated herein.

157.    Prosecutors delegated the practical responsibility for the production of *Brady* material to the Defendants, chiefly Defendant Imparato, during their handling of the case.

158.    When repeatedly pressed by Attorney Russell, prosecutors and Defendant Imperato denied, for almost 20 months, the existence of the exculpatory video evidence that completely cleared Boone of any involvement in Robinson's murder.

159.    The exculpatory video evidence was material to every aspect of Boone's defense because it completely cleared him of any involvement in Robinson's murder.

160.    At any point during Boone's prosecution, any of the Defendants could have provided the exculpatory evidence to prosecutors or directly to Attorney Russell, but they deliberately, intentionally, and recklessly chose not to for 20 months.

161.    The Defendants' actions in withholding the material, exculpatory video evidence and failing to disclose their knowledge of it impacted every aspect of Boone's defense, including but not limited to:

      a.  Depriving his counsel of the evidence necessary to present convincing bail arguments to secure Boone's release from prison,

      b.  Preventing his counsel from pursuing a *Franks* motion to challenge the sufficiency of probable cause in Boone's arrest warrant; and

      c.  Frustrating his counsel's ability to present a case to prosecutors and the court that a dismissal of the charges against Boone was in the interests of justice.

162.    The Defendants' actions and omissions were intentional, deliberate, and reckless.

163.    The Defendants' actions and omissions violated Boone's right to due process under Article First, § 8 of the Connecticut Constitution.

### COUNT NINE – COMMON LAW FALSE ARREST AGAINST ALL DEFENDANTS.

164.    Paragraphs 1 through 163 are incorporated herein.

165.    Each of the Defendants knew of the video surveillance footage that completely cleared Ibo Boone of any involvement in Michael Robinson's murder.

166.    Each of the Defendants knew that the video surveillance footage completely cleared Ibo Boone of any involvement in Robinson's murder.

167.    Defendants Kruger and Lepore knew when they reviewed the video surveillance from Norwalk Hospital that Boone had no involvement in Robinson's murder.

They, however, intentionally or recklessly failed to document their knowledge despite knowing that they should have.

168.    Each of the Defendants provided sworn testimony to the investigative grand jury convened to investigate Robinson's murder.

169.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose that they were in possession of evidence that completely cleared Boone of any involvement in Robinson's murder.

170.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose the evidence that completely cleared Boone of any involvement in Robinson's murder.

171.    At no point in their testimony to the investigative grand jury did any of the Defendants disclose that they knew that Boone had no involvement in Robinson's murder.

172.    At no point in his affidavit for Boone's arrest did Defendant Imparato disclose that police possessed evidence that completely cleared Boone of involvement in Robinson's murder and that he knew of the nature of the exculpatory evidence.

173.    At no point in his affidavit for Boone's arrest did Defendant Imparato disclose that he knew that Boone had no involvement in Robinson's murder.

174.    As a result of these intentional or reckless failures, Boone was arrested and held on a $1,000,000 bond, which he could not afford to post.

175.    At no point during the pendency of Boone's criminal prosecution did any of the Defendants reveal that they knew that the video surveillance footage completely cleared Boone of any involvement in Robinson's murder.

176.    Despite knowing this, Defendant Imparato intentionally or recklessly delayed turning over the video surveillance footage to Attorney Russell for use in Boone's defense for 20 months.

177.    After Defendant Imparato turned over the video surveillance footage to Attorney Russell and he confronted the prosecution about the importance and materiality of the evidence, none of the Defendants told prosecutors or the court that the evidence completely cleared Boone of any involvement in Robinson's murder despite knowing that it did.

178.    Instead, the Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

179.    The Defendants maintained this false narrative for over a decade.

180.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

181.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no lawful basis for Boone's arrest.

182.    The Defendants' actions and omission constitute the common law tort of false arrest.

## COUNT TEN – COMMON LAW MALICIOUS PROSECUTION AGAINST ALL DEFENDANTS

183.    Paragraphs 1 through 182 are incorporated herein.

184.    The Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

185.    The Defendants maintained this false narrative for over a decade.

186.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

187.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest and continued imprisonment.

188.    The Defendants' actions and omissions initiated and continued criminal proceedings against Boone.

189.    The criminal proceedings against Boone terminated in his favor by virtue of his jury's acquittal on all charges.

190.    The Defendants acted without probable cause in securing his arrest.

191.    The Defendants acted with malice toward Boone by profiling him, based on their own prejudices, as a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

192.    The Defendants' actions and omissions constitute the common law tort of malicious prosecution.

## COUNT ELEVEN – COMMON LAW FALSE IMPRISONMENT AGAINST ALL DEFENDANTS.

193.    Paragraphs 1 through 192 are incorporated herein.

194.    The Defendants, individually and collectively, created a false narrative that Boone was a violent, out-of-state drug dealer who doubled as an enforcer for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

195.    The Defendants maintained this false narrative for over a decade.

196.    The Defendants' actions and omissions constitute an intentional, deliberate falsehood, fraud upon the Connecticut Superior Court, and a reckless disregard for the truth.

197.    The evidence and facts omitted by the Defendants and concealed for more than a decade would have led any reasonable judge to conclude that there was no probable cause for Boone's arrest and continued imprisonment.

198.    The Defendants' actions and omissions initiated and continued criminal proceedings against Boone.

199.    The criminal proceedings against Boone terminated in his favor by virtue of his jury's acquittal on all charges.

200.    The Defendants acted without probable cause in securing his arrest.

201.    The Defendants acted with malice toward Boone by profiling him, based on their own prejudices, as a violent, out-of-state drug dealer who doubled as an enforcer

for a major national gang and that he was responsible for shooting Robinson in the back over a debt owed.

202.    As a result of the Defendants' conduct, Ibo Boone – an innocent man – was unlawfully arrested and imprisoned for 5 years, 1 month, and 15 days.

203.    The Defendants' actions and omissions constitute the common law tort of false imprisonment.

## **DEMAND FOR RELIEF**

Wherefore, the Plaintiff, Ibo Boone, hereby respectfully requests the following relief:

A.  An order holding the Defendants jointly and severally liable as permitted by law;

B.  Compensatory damages;

C.  Punitive damages;

D.  Costs and attorney's fees;

E.  Any such further relief that the Court deems just and equitable.

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

## JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution, the Plaintiff, Ibo Boone, claims his right for a trial by jury.

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com